IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,175





CHRISTIAN OLSEN, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 07-04601-CRF-361


IN THE 361ST JUDICIAL DISTRICT COURT


BRAZOS COUNTY






 Keasler, J., delivered the opinion of the Court in which Price, Womack,
Johnson, Hervey, Cochran, and Alcala, JJ., joined. Keller, P.J., filed a
concurring opinion. Meyers, J., dissented.


O P I N I O N



 In February 2009, a jury convicted Christian Olsen of capital murder. (1) Based on the
jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, Sections 2(b) and 2(e), the trial judge sentenced Olsen to death. (2) Direct appeal to
this Court is automatic. (3) We affirm the judgment of guilt, but we reverse Olsen's sentence
and remand the case to the trial court for a new punishment hearing.

I. Background

 At noon on June 3, 2007, Etta Jean Westbrook left church services and went to her 
home in Bryan, Texas. Around midnight, Hazel Ogden, Westbrook's best friend, received
a phone call from Westbrook's alarm company, alerting her that an alarm went off in
Westbrook's home. Ogden waited for the police to meet her at Westbrook's house. The
responding officer believed that the house was secure, but Ogden insisted that something was
wrong because both of Westbrook's vehicles were in the driveway and a light was on inside
the house. Looking through the kitchen window, Ogden was able to see raw chicken sitting
on the counter and convinced the officer that this was something that "[Westbrook] wouldn't
do." They opened the back door, which was unlocked, and found Westbrook's body lying
on the living room floor. 

 According to Ogden, Westbrook's hair was "wet," and there was a large wet spot on
the carpeted floor. The responding officer observed that Westbrook's hair was matted with
blood and that there was a large laceration on her forehead. Although it did not appear that
there was any blood at the scene, later tests for latent blood indicated that blood had been
cleaned up from the area where Westbrook's body was found. There were cleaning products,
including bleach, on Westbrook's back porch.

 Several hours later, Westbrook's son, Curtis, accompanied officers through the house
to determine whether anything was missing. Curtis told them that credit cards and cash were
missing from his mother's purse, which should not have been in the guest room where it was
found. Westbrook's other son, Randy, told the police that a railroad spike used for keeping
a kiln propped open was missing from his mother's garage.

 Detective Steven Fry of the Bryan Police Department learned that Westbrook's credit
cards had been fraudulently used after her death. Records of her two credit card accounts
confirmed that the cards had been used several times after her death. Fry obtained
surveillance videos corresponding to most of the fraudulent transactions, which occurred
between approximately 2:00 p.m. and 8:15 p.m. on June 3, 2007. On the videos,
investigators saw Olsen, sometimes in the company of Kelly Sifuentez, using Westbrook's
credit cards at H.E.B., Target, and Wal-Mart in Bryan and College Station. The fraudulent
transactions totaled less than $1,500.

 The police obtained a warrant for Olsen's arrest and took him into custody at his and
Kelly Sifuentez's residence, which was located across the street from Westbrook's home. 
Olsen admitted to the police that he used the ruse of returning a borrowed baking pan to enter
Westbrook's home. He stated that he struck Westbrook in the head with a "piece of metal"
from her garage, causing her death. The evidence showed that Westbrook sustained twenty-five blows to the head and had been strangled. After murdering Westbrook, Olsen took her
credits cards and hid her purse in a spare bedroom. Olsen also told the police that he cut
himself during the commission of the offense and had cleaned up in the bathroom. A DNA
analysis identified Olsen as the source of blood found in Westbrook's sink.

 Olsen told the police that he discarded the weapon, the clothes that he was wearing
during the offense, and Westbrook's wallet. The police were unable to find the weapon, even
after searching the local landfill. The wallet, however, was given to the police by Sifuentez's
sister. It contained Westbrook's credit cards and family photos.

 The State charged Olsen with capital murder and notified him of its intent to seek the
death penalty. Following his conviction and sentencing, Olsen filed a notice of appeal. He
requests a new trial because the trial judge erroneously denied a lesser-included-offense
instruction on murder. He presents forty-four other issues and requests that we either render
a sentence of life imprisonment or reverse his sentence and remand for a new trial on
punishment. 

 Because we sustain issues fifteen and sixteen and remand for a new punishment
hearing, we need not address all of Olsen's issues. However, we proceed to address several
of his other the issues that are either dispositive or are likely to recur on remand. (4) We begin
with the only issue that Olsen presents regarding the guilt-innocence phase.

II. Murder Instruction

 In issue six, Olsen asserts that the trial judge committed harmful error by denying his
timely request to submit a lesser-included-offense instruction on murder. Specifically, Olsen
claims that the jury could have rationally found that he lacked the intent-to-kill, a requirement
of capital murder under Penal Code Section 19.03(a)(2), and only knowingly killed
Westbrook. (5) Olsen argues that the error was harmful and requests that we reverse his
conviction and remand for a new trial. 

 We apply a two-step analysis in determining whether a trial judge erred in refusing
a request for a lesser-included-offense instruction. (6) "The first step is to decide whether the
offense is actually a lesser-included offense of the offense charged." (7) Because we have
already held that "[m]urder is a lesser-included offense of capital murder," (8) we proceed to
the second step.

 The second step is to determine whether the record contains some evidence permitting
"a rational jury to find that the defendant is guilty only of the lesser offense." (9) A capital
defendant is entitled to a lesser-included-offense instruction on murder only if there is some
evidence from which a rational jury could acquit the defendant of capital murder while
convicting him of murder. (10) "[I]t is not enough that the jury may disbelieve crucial evidence
pertaining to the greater offense . . . ." (11) There must be affirmative evidence directly
germane to the existence of the lesser-included offense. (12) "We review all of the evidence
presented at trial," (13) but we may not consider "[t]he credibility of the evidence and whether
it conflicts with other evidence or is controverted." (14) The evidence must establish murder
as a valid rational alternative to capital murder. (15) 

 A person commits capital murder if he, with the intent-to-kill, commits a murder in
the course of committing or attempting to commit a robbery. (16) A person commits murder if
he causes the death of an individual either intentionally or knowingly. (17) "A person acts
intentionally . . . with respect . . . to a result of his conduct when it is his conscious objective
or desire to . . . cause the result." (18) "A person acts knowingly . . . with respect to a result of
his conduct when he is aware that his conduct is reasonably certain to cause the result." (19) 
Therefore, to be entitled to a lesser-included-offense instruction on murder, Olsen must show
that there is some affirmative evidence from which a jury could rationally find that he lacked
the intent to kill Westbrook and only knowingly caused her death. (20)

 Olsen argues that the evidence from which the jury could have rationally found that
he lacked the intent-to-kill is the medical examiner's testimony that: (1) "most of the skull
fractures came from one particular blow"; (2) the injury to Westbrook's neck theoretically
could have been caused by one blow rather than strangulation; and (3) there were no
petechiae in Westbrook's eyes, and petechiae is normally observed in strangulation cases. 

 But a complete review of the record (21) reflects the following: Olsen used the ruse of
returning a borrowed baking pan to enter Westbrook's home. Westbrook regularly kept two
railroad spikes in her garage; after her murder, only one remained. Olsen admitted in his
statement to police that he struck Westbrook with "[s]ome piece of metal" that he found in
her garage, and then stole her credit cards, and hid her purse in a spare bedroom. Westbrook
suffered at least twenty-five different and significant blows to her head. Olsen then cleaned
the scene, and cleaned up blood near Westbrook's body. Finally, he cleaned himself in
Westbrook's bathroom before leaving her house.

 In addition to the medical examiner's testimony to which Olsen refers, the medical
examiner also testified that Westbrook died as a result of blunt force trauma to the head and
strangulation. Her skull suffered "extensive fracturing," including one fracture that extended
around the entirety of her skull. She had defensive wounds to her hands, wrists, and
forearms. Her eyes were swollen shut, and she had lacerations on her forehead, scrapes and
bruises to her face, and bruising on her neck. The autopsy also revealed sufficient
strangulation to have cracked the bones of her voice box. 

 None of these circumstances would permit a jury to rationally conclude that Olsen
lacked the intent to kill Westbrook. (22) Thus, the evidence does not establish murder as a valid
rational alternative to capital murder. (23) Therefore, we overrule Olsen's sixth issue.

III. Dr. Vandiver's Testimony

 In issues fifteen and sixteen, Olsen argues that the trial judge abused his discretion and
violated his rights under the Sixth, Eighth, and Fourteenth Amendments by ruling that Dr.
Donna Vandiver was not qualified to provide expert testimony about female sex offenders
and grooming. The record indicates that Olsen intended to argue at the punishment phase
that he was the victim of a female sex offender, Kelly Sifuentez, and that her negative
influence over him through "grooming" was a mitigating circumstance and relevant to future
dangerousness. He requests a new punishment hearing, arguing that this constitutional error
was harmful.

A. Background

 During voir dire examination, Dr. Vandiver stated the following: she is an associate
professor at Texas State University and has taught criminal justice classes there for two
years. She was previously an assistant professor at Illinois State University for five years and
taught the same curriculum. She received her Ph.D. in criminal justice from Sam Houston
State University in 2002 and has an undergraduate degree in psychology. She had been a
counselor for five years at two mental health centers but was not a qualified psychologist. 
As a counselor, she became familiar with clinical depression because many of her clients
suffered from it. 

 Dr. Vandiver stated that although she did not interview Sifuentez, she received
information about Sifuentez, Olsen, and their relationship from Olsen's mother, Sifuentez's
medical records, and reading Sifuentez's and Olsen's romantic letters to each other. From
her review of this information, Dr. Vandiver also learned that Sifuentez suffered from
depression, would host and supervise get-togethers that Olsen would sometimes attend and
her own daughter would not, would bring Olsen food late at night, bought him a cell phone,
and let Olsen live with her after he turned eighteen. Dr. Vandiver also learned that Sifuentez's
husband was incarcerated a few years before Olsen moved in with her. was separated from her
husband when he was incarcerated. 

 Dr. Vandiver stated that she would not render any psychological opinion regarding Sifuentez,
but instead planned to answer hypothetical questions. More specifically, she would testify whether
Sifuentez's characteristics and interactions with Olsen were consistent with a female sex offender
who was grooming her victim. 

 Dr. Vandiver also discussed the characteristics of female sex offenders. She stated that they
are typically in their thirties or forties and usually have some position of authority and history of
depression. Female sex offenders typically groom their victims. They view the grooming as
mutually beneficial rather than harmful. Usually, some sort of life stressor, such as losing a job, will
cause a female sex offender to initiate a relationship with the victim. 

 The prosecution objected to Dr. Vandiver's testimony on several grounds: including
that she was not qualified to interpret psychological and psychiatric records; there was
insufficient evidence that Sifuentez was a sex offender; Dr. Vandiver's testimony would not
be on a proper subject for expert testimony; and her testimony would confuse the jury. To
support its objection to exclude Dr. Vandiver's testimony because she was not qualified, the
State had her repeatedly admit that she was not qualified to interpret Sifuentez's
psychological or psychiatric records or to diagnose Sifuentez with depression. 

 The trial judge excluded Dr. Vandiver's testimony, explaining that he believed the
State's objection was well-grounded "[b]ased on Daubert." However, voir dire was
reopened to permit Dr. Vandiver to respond to sample hypothetical questions the defense
intended to ask. Dr. Vandiver further explained the techniques of female sex offenders. She
stated that grooming can include finding out what a child wants and providing it to him, such
as a car ride somewhere or bringing him his favorite food. It can start out with something
very small and evolve into bigger things that the victim may want. Grooming is very
systematic and occurs over a long period of time. 

 Dr. Vandiver stated that the more damaging part of the relationship is the grooming,
not the sex act, because grooming drives a wedge between the victim and his family, school,
church, and peer groups that he usually associates with. The grooming continues regardless
of whether there is a sex act, and victims can be groomed for several years before the
relationship becomes sexual. She stated that a hypothetical fifteen-year-old who suddenly
started becoming truant, running away from home, stealing from his parents, and becoming
very secretive would be exhibiting characteristics consistent with a victim of grooming. 

 After the continued voir dire examination, the trial judge did not change the ruling. 
He stated:

 My ruling is based upon the fact that I don't believe she qualifies under [Rule]
702 to render the opinion that she's going to render, because I do think it's
more of a psychological opinion. I will let you make your record.


 I am also making this ruling based upon the fact that the jury does already have
abundant evidence from which they can potentially draw a conclusion that this
man was in a relationship with an older woman and that she had expressed an
interest in seeing her mother dead, and I think they're arguing to the jury
mitigating circumstances for this particular individual.

 

 Were it not for all of that information, my decision would be harder, but I still
think everything in the context that it is, it's a very, very difficult decision, but
I think my decision is going to stay the same.

 In a bill of exception, Dr. Vandiver restated her educational and research background. 
She added, however, that her Ph.D. dissertation was on the subject of female sex offenders. 
She studied 471 adult women and 61 juvenile female sex offenders and developed a
typology. Specifically, she identified two types of female sex offenders: the co-offender and
the nurturer, the nurturer being more common. The nurturer is usually in her thirties or
forties, and her victim is usually a teenage male. Typically, the nurturer has some sort of
history of depression and position of authority or trust with the victim, such as a teacher,
supervisor, caretaker, or someone with oversight of the child.

 Dr. Vandiver explained that the nurturer grooms the victim and described grooming
as a "systematic process where the sole goal is to gain access to the child for inappropriate
sexual behavior." Sometimes the child can be groomed quickly, but other times it can take
years. Examples of grooming include buying the child a gift, befriending him, and
condoning his behaviors that others disapprove of. Secrecy plays a large part in grooming
by enhancing the offender's control over the victim. This control is used to drive a wedge
between the victim and his friends and family. The offender may also buy gifts or offer
alcohol or drugs to the victim to entice him to stay with her instead of spending time with his
friends and family. 

 When the sexual abuse begins, the victim, Dr. Vandiver explained, will suffer several
negative consequences such as low self-esteem, which is then externalized through
troublesome behavior such as stealing, problems at school, and running away from home. 
This tends to give the offender more control over the child. The victim will usually withdraw
from his activities and other relationships because he will lose interest. The victim
sometimes will not "age out" of being controlled after turning seventeen or eighteen, and the
female will continue grooming the victim as a matter of habit. 

 Another researcher reexamined Dr. Vandiver's typology, observed a similar typology,
and concluded that Dr. Vandiver's methods were "fairly robust." After Dr. Vandiver
published her dissertation, she published five additional works on female sex offenders and
had researched female sex offenders for about ten years total. 

 Dr. Vandiver also discussed the history of how sexual offenses were treated and
viewed by society in the first half of the twentieth century. She explained that female rape
victims were often blamed as the instigator, but she also explained how that view and views 
about date rape have changed. She also discussed research regarding male children who have
been sexually abused by females. Research shows that male victims will typically deny being
a victim, even when asked, and that agencies need to have better policies to deal with male
victims. Dr. Vandiver discussed research by a social worker about gender bias in agency
response. The research revealed that some practitioners minimized the severity of sexual
abuse of boys, laughed at it, and said, "Well, if it's a boy, he probably wanted to have sex." 
Many agencies did not have forms for male victims to fill out. 

 Following the bill of exception, the trial judge stated that the ruling would remain the
same. Olsen then made objections grounded in the state and federal constitutions, the rules
of evidence, and Article 37.071, arguing that Dr. Vandiver's testimony was relevant to both
mitigation and future dangerousness. The trial judge overruled these objections. 

B. Error Analysis 

 The Texas Rules of Evidence set out three separate conditions regarding the
admissibility of expert testimony. First, Rule 104(a) requires a trial judge to determine
"[p]reliminary questions concerning the qualification of a person to be a witness." (24) Second,
Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier
of fact to understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education may testify thereto in the form
of an opinion or otherwise." (25) And third, Rule 401 renders relevant evidence admissible, and
Rule 402 defines "relevant evidence" as "having a tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less probable than
it would be without the evidence." (26)

 These rules require a trial judge to make three separate inquiries, all of which must
be met before admitting expert testimony: "(1) the witness qualifies as an expert by reason
of his knowledge, skill, experience, training, or education; (2) the subject matter of the
testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony
will actually assist the fact-finder in deciding the case." (27) These inquiries are commonly
referred to as qualification, reliability, and relevance, respectively. (28)

 We review a trial judge's ruling regarding an expert's qualifications and the
admissibility of expert testimony for an abuse of discretion. (29) We "must uphold the trial
court's ruling if it was within the zone of reasonable disagreement." (30) Even when the trial
judge gives the wrong reason for his decision, we will sustain the ruling if it is correct on any
theory of law applicable to the case. (31) 

 We begin our analysis with whether the trial judge's exclusion of Dr. Vandiver's
testimony based on her lack of qualifications to render a psychological opinion was within
the zone of reasonable disagreement. (32)

1. Qualification

 "The question of whether a witness offered as an expert possesses the required
qualifications rests largely in the trial court's discretion. Absent a clear abuse of that
discretion, the trial court's decision to admit or exclude testimony will not be disturbed." (33)
A witness's qualification to give an expert opinion may be derived from specialized
education, practical experience, a study of technical works, or a varying combination of these
things. (34) "Through interviews, case studies, and statistical research, a person may acquire
superior knowledge concerning the behavior of offenders" who sexually victimize children. (35) 
Several courts, including this one, have upheld the admission of expert testimony about
grooming from social workers, agents of law enforcement, and counselors. (36) Similarly, a
proffered expert who is not a psychologist or psychiatrist may nevertheless be qualified to
testify about the effects of sexual abuse on a child victim's behavior. (37)

 The following evidence, considered together, establishes that Dr. Vandiver was a
qualified expert in the area of female sex offenders and grooming. She had advanced
degrees in criminal justice, including a Ph.D. She was an associate professor and had taught
university-level courses on criminological theory and current issues, sex offenders, and
research methods for seven years. Dr. Vandiver also worked for five years as a counselor
at two mental health centers and was familiar with other published research in the field and
the pertinent conclusions resulting from those studies.

 The trial judge was persuaded by the State's argument and excluded Dr. Vandiver's
testimony because it was "more of a psychological opinion." This basis for excluding her
testimony is not supported by the record or the law. In Morris v. State, we determined that
to testify about grooming, an expert witness need not be a qualified psychiatrist or
psychologist, so long as the witness has some other basis of expertise. (38) The expert witness
in Morris did not purport to testify as a psychologist. (39) We reached the same conclusion on
similar facts in Nenno where we determined that a witness, although not a psychologist or
psychiatrist, gained sufficient expertise through his research. (40) 

 Here, Dr. Vandiver never purported to testify as a psychologist or to diagnose
Sifuentez. Dr. Vandiver read Sifuentez's psychological records and took the psychological
conclusions contained therein--for example, that Sifuentez suffered from depression--at
face value. She explained that Sifuentez's depression was only one of several characteristics
of grooming, and that she did not even need to rely on those records to testify. Although Dr.
Vandiver admitted that she was not qualified to diagnose someone with depression, she knew
what depression meant from her work as a counselor to patients who suffered from major
depression. Moreover, her responses to hypothetical questions confirmed that she would not
interpret psychological or psychiatric records, or render a psychological opinion. 

 Because the record in this case establishes that Dr. Vandiver qualified as an expert on 
grooming and female sex offenders through her research and experience, (41) the trial judge's
decision to exclude Dr. Vandiver's testimony because she was not qualified to render a
psychological opinion was outside of the zone of reasonable disagreement. (42) However, we
proceed to address the admissibility of Dr. Vandiver's testimony more broadly to consider
whether the record supports any other theory upon which we should sustain the trial judge's
ruling. (43) We therefore turn to whether Dr. Vandiver's testimony was reliable.

2. Reliability

 For assessing the reliability of expert testimony, we analyze the admissibility of expert
testimony on the subject of grooming under Nenno's framework concerning fields of study
outside the hard sciences. (44) The Nenno framework consists of three questions: (1) whether
the field of expertise is a legitimate one; (2) whether the subject matter of the testimony is
within the scope of that field; and (3) whether the testimony properly relies upon or utilizes
the principles involved in the field. (45) We now turn to analyzing these three questions.

 In Morris, we answered the first two questions regarding grooming in the
affirmative. (46) Thus, we need to consider only the third inquiry under Nenno, which is
whether the expert's testimony properly relied upon or utilized the principles involved in the
field. (47) In answering this question, we consider not only our previous discussion of Dr.
Vandiver's qualifications, but also whether she sufficiently articulated the specific principles
underlying her expected testimony. (48) 

 Dr. Vandiver articulated the following underlying principles regarding female sex
offenders and grooming. Grooming is a systematic process that can develop rapidly or take
a long period of time. Sometimes grooming occurs years before the first sex act. The
offender is usually thirty to forty years old and has a history of depression. A major life
stressor can prompt her to initiate a relationship with the child. She ordinarily assumes a role
as a trusted adult in the child's life, usually by obtaining a position of authority over the child. 
She discovers what the child wants in order to provide it to him. Examples can range from
getting him his favorite food to buying him a cell phone. The goal of grooming is to gain
control over the victim by developing an exclusive relationship and to drive a wedge between
him and his family and friends. The victim does not "age out" of the cycle of grooming just
because he turns seventeen, even though a sexual relationship would not be illegal at that
point. The offender will continue acting as she had done before and attempt to maintain
control over the child, sometimes by introducing drugs or alcohol into the relationship. 
Long-term effects of grooming can include low self-esteem, acting out delinquently, running
away from home, stealing, and truancy. Problems at school can vary significantly based on
whether the victim is male or female. If the child engages in illegal activity, the offender
gains even more control by giving the child the message that he may engage in those
activities with her approval even when other people in his life would disapprove or punish
him. Recent articles advise that male victims will typically deny sexual abuse, even when
they are asked directly.

 We conclude that Dr. Vandiver sufficiently articulated the specific principles upon
which her testimony would rely. We therefore conclude that Dr. Vandiver's testimony was
reliable. (49)

3. Relevance

 We next turn to the question of whether Dr. Vandiver's testimony was relevant to
assist the jury. For the proffered expert testimony to be relevant to assist the jury, the expert
must make an effort to tie pertinent facts of the case to the principles that are the subject of
her testimony. (50) Rule of Evidence 703 permits an expert to base her opinion testimony on
data and facts made known to her during trial. (51) An expert witness's testimony may also
consist of answers to a hypothetical questions. (52) Although the hypothetical questions must
be based on facts in evidence, there is no requirement that these facts be proved beyond a
reasonable doubt. (53) Indeed, in propounding the question to the witness, counsel may assume
the facts in accordance with his theory of the case. (54) An expert's testimony is not irrelevant
simply because it is based on information provided by the defendant or a member of his
family. (55) The fact-finder judges the credibility of the evidence and, consequently, the opinion
of the expert witness based on that evidence. (56)

 Dr. Vandiver stated that after the defense team contacted her, she reviewed Olsen's
and Sifuentez's letters to each other. She also interviewed Olsen's mother, who explained
her perception of the nature of Sifuentez's relationship with Olsen. Dr. Vandiver also
reviewed Olsen's juvenile records, including reports prepared by Olsen's mental-health-care
providers, and Sifuentez's mental health records. 

 Based on the information that was provided to her, Dr. Vandiver testified that
Sifuentez's relationship with Olsen was consistent with the grooming profile. There was
information that from the time when Olsen was fourteen, Sifuentez, who was then thirty-six
years old, systematically engaged in behaviors that undermined Olsen's parents' authority,
alienated him from his family, and encouraged and assisted him in delinquent behaviors such
as running away, theft, and truancy. Sifuentez entered and exited Olsen's bedroom through
the window late at night to bring him food. She also provided him with a cell phone after his
parents took his phone away from him. Dr. Vandiver testified that these were "hallmarks"
of grooming. Sifuentez also called Olsen late at night, and her calls were often followed by
Olsen sneaking away to her house. Sifuentez refused to answer her door when Olsen's
parents went to her house looking for him. At Olsen's high school, Sifuentez's contact
information was substituted for Olsen's parents' information, so that Sifuentez rather than
Olsen's parents would be notified when he was truant.

 Before Olsen met Sifuentez, he played several team sports, participated in church
groups, and regularly attended church and school. The juvenile records confirmed that
Olsen's parents reported their concerns about an inappropriate relationship to the juvenile
authorities, who made notes of them in Olsen's records but took no further action. Olsen's
mother testified that Olsen's conduct and his relationship with his parents would improve
during periods when he was away from Sifuentez, but would deteriorate again when the two
regained contact.

 In response to hypothetical questions that mirrored the facts of the case, Dr. Vandiver
explained that this scenario was consistent with the typical grooming behavior of a female
sex offender and the typical response of a teenaged male victim who had been the target of
grooming. The record reflects that Dr. Vandiver properly applied the relevant concepts from
her area of expertise to hypothetical questions based on the facts in evidence. 

 The State contends that the core issue comes down to the relevance of Dr. Vandiver's
testimony because there was no direct evidence that Sifuentez committed a sex offense with
Olsen, and thus the principles of grooming were not relevant to the facts of the case. 
However, the record shows that when Olsen was a child, Sifuentez wrote him romantic
letters. Sifuentez would visit Olsen's bedroom at night. And Olsen would spend nights with
Sifuentez at her home, even when Sifuentez's daughter was not there. Dr. Vandiver testified
that the grooming process sometimes develops years before there is a sex act, and the
grooming is more harmful to the child than the sex act. While the State might be correct that
this evidence does not prove beyond a reasonable doubt that Sifuentez committed a discrete
sex offense, this was not a prerequisite to the admissibility of Dr. Vandiver's testimony. (57)

 The State also argues that the trial judge's ruling should be upheld because, even
before Olsen met Sifuentez, he acted out as a child by lying and committing theft. While this
might be an argument regarding the weight the jury should give to Dr. Vandiver's testimony,
it does not render Dr. Vandiver's testimony irrelevant. (58)

 In a footnote in its brief, the State suggests that the trial judge's ruling could be
supported under Texas Rule of Evidence 403. Specifically, the State asserts that without
direct evidence of a sexual relationship between Sifuentez and Olsen, Dr. Vandiver's
testimony that Sifuentez's actions were consistent with a female sex offender poses the
danger of unfair prejudice. The State also asserts that Dr. Vandiver's testimony is
cumulative of other evidence and would have likely confused the jury. In light of our
relevance analysis, we are not persuaded that the State's arguments under Rule 403 are
theories that require us to sustain the trial court's ruling.

4. Conclusion

 Based on the foregoing, we hold that the trial judge abused his discretion by excluding
Dr. Vandiver's testimony. Moreover, the record does not support any other theory upon
which we should sustain the trial judge's ruling. (59) Thus, we consider whether this error
harmed Olsen. 

C. Harm Analysis 

 The erroneous exclusion of constitutionally relevant mitigating evidence offered by
a defendant facing a possible death sentence is analyzed for harm under Texas Rule of
Appellate Procedure 44.2(a). (60) Such error requires reversal unless we determine beyond a
reasonable doubt that it did not contribute to the punishment. (61) 

 In reviewing the record, Olsen's need for Dr. Vandiver's testimony is obvious. At the
punishment phase, the defense sought to attribute much of Olsen's delinquent and criminal
conduct to his relationship with Sifuentez, while the State sought to minimize the possibility
that Sifuentez's influence had any effect on Olsen. The State acknowledged that there was
evidence of a romantic and inappropriate relationship when Olsen was younger than
seventeen, but argued that this relationship was irrelevant because there was no direct
evidence of sexual activity before Olsen moved in with Sifuentez. Alternatively, the State
took the position that even if Olsen had a sexual relationship with Sifuentez before he turned
seventeen, this relationship would not have harmed him or caused him to act out negatively.

 The State's future-dangerousness expert testified that it was not uncommon for
fourteen- and fifteen-year-old boys to have sex. He did not give a direct answer when he was
asked whether a sexual relationship between a fifteen-year-old boy and a thirty-five-year-old
woman would negatively affect the boy's behavior; instead, he stated that the boy would
probably "be grateful" to the woman who had sex with him. He testified through the use of
hypothetical questions that it was just as likely that Olsen did not like the rules in his parents'
house and preferred a permissive household such as Sifuentez's because he was delinquent
and antisocial, as it was that Olsen became delinquent and antisocial as a result of Sifuentez's
influence. In arguing that Olsen's relationship with Sifuentez was not significant and did not
involve sexual abuse, the State emphasized that Olsen's mental-health and juvenile records
contained no admission by Olsen that he was dating an older woman, no outcries of sexual
abuse, and no referrals to protective services. The State also emphasized that Olsen did not
meet Sifuentez until he was fourteen years old, but that he had lied since the age of ten and
began stealing at the age of twelve.

 The prosecutor also discredited Olsen's parents' testimony about their concerns and
suspicions regarding Sifuentez, arguing that Sifuentez could not have influenced Olsen
unless he was already inclined to delinquency, and that Olsen's parents were driven by their
love for their son into rationalizing his delinquent and criminal behavior. Finally, the State
argued that Sifuentez had nothing to do with the offense of conviction and an extraneous
murder offense the State argued he committed, asserting that there was no evidence of
Sifuentez's involvement and that Olsen was just trying to cloud the issue and divert
responsibility.

 At the same time that the State sought to discredit the defense's position that Olsen's
relationship with Sifuentez negatively affected him, it relied on Olsen's mental health records
and his records of delinquent and criminal behavior as evidence that Olsen had a conduct
disorder as a juvenile and an antisocial personality disorder as an adult, and therefore he
would be a future danger.

 Olsen's inappropriate relationship with Sifuentez, and its potential negative effect on
him, were the core of the defense's case at punishment. Dr. Vandiver's proffered testimony
would have provided the jury with a framework for understanding the potential mitigating
value of much of the other mitigating evidence. Her testimony would have educated the jury
concerning the harmful effects and influence that a relationship like the one between
Sifuentez and Olsen could have on a teenaged boy, and the typical behavioral problems
exhibited by the victims of such relationships. Her testimony would have responded to the
State's position that this relationship was not harmful and that Olsen would not have acted
out unless he was already inclined to delinquency. In addition, Dr. Vandiver's testimony
would have challenged the State's position that such a relationship would have shown up in
Olsen's juvenile and mental health records if it had existed or if it had been significant to
Olsen.

 Thus, without Dr. Vandiver's testimony, the jury was unable to fully comprehend the
mitigating potential of the evidence that was before it. (62) Further, Olsen was unable to
respond to the State's evidence and argument discounting the mitigating potential of this
evidence, and he was unable to explain or rebut the State's future-dangerousness evidence
and argument. (63) Because we are unable to determine beyond a reasonable doubt that the
erroneous exclusion of Dr. Vandiver's testimony did not contribute to the punishment, we
sustain issues fifteen and sixteen.

IV. Remaining Issues

A. Punishment Charge

 In issues eighteen and nineteen, Olsen complains that the trial judge erred in
overruling his objections to the punishment charge on grounds that it did not include
definitions for "probability" and "reduce moral blameworthiness." In issue twenty, Olsen
complains that the trial court erred because the punishment charge did not instruct the jury
that "society meant society in prison--- not in the free world." We have previously rejected
these and similar complaints in other cases. (64) Issues eighteen, nineteen, and twenty are
overruled.

 In issue twenty-one, Olsen argues that he was denied a fair and impartial punishment
trial when the trial judge overruled his objection that the punishment charge did not contain
an instruction requiring that extraneous offenses or misconduct be proven beyond a
reasonable doubt. During the punishment phase, the State presented evidence that Olsen was
involved in the death of Geraldine Lloyd, Sifuentez's elderly mother. In issue twenty-two,
he complains that the trial judge overruled his objection that the jury was not instructed that
"it could not consider the murder of Geraldine Lloyd in answering the special issues unless
[jurors] believed beyond a reasonable doubt that [Olsen] caused [her death]."

 In his brief, Olsen acknowledges that this Court has rejected these and similar
arguments in the past and has held that as long as the punishment charge properly requires
that the State prove the special issues, other than the mitigation issue, beyond a reasonable
doubt, there is no unfairness in not including an instruction regarding the burden of proof for
extraneous offenses. (65) The record in this case shows that the jury received instructions
properly requiring that the special issues, other than the mitigation issue, be proven by the
State beyond a reasonable doubt. The trial judge did not err in overruling Olsen's objections. 
Issues twenty-one and twenty-two are overruled.

 In issue twenty-three, Olsen complains that he was denied a fair and impartial
punishment trial because the punishment charge limited the jury's consideration of mitigating
evidence to that which might "reduce moral blameworthiness," which he alleges is
constitutionally impermissible. In issue twenty-four, Olsen complains that the punishment
charge did not "instruct jurors that the State is required to prove beyond a reasonable doubt
there is not sufficient mitigating circumstances to warrant a sentence of death." The
punishment charge in this case followed the language of Article 37.071. These and similar
arguments challenging Article 37.071 have been previously rejected by this Court in other
cases. (66) Olsen provides us with no reason to review our precedent in this area. These issues
are overruled.

B. Future Dangerousness

 In issue thirty, Olsen challenges the legal sufficiency of the evidence supporting the
jury's future-dangerousness finding. When reviewing a legal-sufficiency challenge to a
jury's finding of future dangerousness, "we view the evidence in the light most favorable to
the jury's finding and determine whether any rational trier of fact could have found beyond
a reasonable doubt that there is a probability that appellant would commit criminal acts of
violence that would constitute a continuing threat to society." (67) A jury may consider a variety
of factors when determining whether a defendant will pose a continuing threat to society. (68) 
For example, the facts of the offense alone may be sufficient to sustain the jury's finding of
future dangerousness. (69) We must view all of the evidence in the light most favorable to the
jury's finding and determine whether, based on that evidence and reasonable inferences
therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the
future-dangerousness issue was "yes." (70)

 In addition to the facts surrounding Olsen's murder of Westbrook, the jury heard
testimony that Olsen had previously stolen and used Westbrook's credit cards without her
permission. In March 2007, Olsen employed the ruse of needing to use the telephone to enter
Westbrook's home to gain access to her credit cards.

 The jury also heard evidence of Olsen's delinquent and criminal history. Olsen was
adjudicated delinquent for theft and for felony credit-card abuse. He was given the
opportunity to complete a conditional-release program, but he violated the conditions of that
program by taking his parents' car. He was then placed on formal probation. Olsen violated
the terms of his probation by cutting off his electric monitor, refusing to obey his parents,
violating his curfew, running away, having a prohibited cell phone, and taking money from
his mother's purse. 

 Because of these violations, Olsen's probation was modified, and he was placed in a
boot-camp facility. Upon his release from the facility, Olsen again violated the terms of his
probation by not attending school. He was once again fitted with an electronic monitor,
which he cut off. Olsen's probation was again modified, and he was sent to complete his
probation at Miracle Farm, a residential outreach facility for at-risk boys, where he
completed high school before his release in December 2004.

 In January 2006, after he turned eighteen, Olsen's parents asked him to leave their
home. As an adult, Olsen continued to run afoul of the law. He was convicted of evading
arrest, theft by check, forgery of a financial instrument, and theft of property. He also had
two unadjudicated offenses of admitted to driving with an invalid license twice. Olsen
committed the instant offense when he was nineteen. Sergeant Kevin Stuart with the Brazos
County Sheriff's Office testified that in his opinion, Olsen was a bad inmate during his
incarceration prior trial for this offense.

 The State also presented psychological testimony from several sources. Michelle
Fecowycz, a psychologist with Brazos County Juvenile Services, interviewed Olsen during
the time he was supervised by the juvenile probation department. The following portion of
her report was read to the jury:

 Personality testing suggested significant unruly personality traits where he is
resistant to limits that are placed on his behavior and tends to be rejecting of
social norms for age-appropriate behavior. Besides his criminal behavior,
there also appears to be a pattern of lying in an attempt to avoid consequences
that is more intense than what is expected for his age.


The jury also heard Fecowycz's assessment that Olsen was "lacking remorse, as most
feelings of regret over his behavior seem to occur only when he is caught doing something
wrong." In evaluating Olsen's personality, Fecowycz found that Olsen presented a
"dramatizing, egotistical personality style, where narcissistic attitudes are present as well as
self-centeredness."

 Before Olsen was placed on juvenile probation, his parents sent him to Dr. DeWayne
Taylor for counseling. Dr. Taylor continued to provide the majority of Olsen's mental health
care during his probation. Dr. Taylor prepared a report that was contained in Olsen's
juvenile record and read, in part, to the jury. The jury heard Dr. Taylor's assessment of
Olsen, which "point[ed] to the presence of a conduct disorder/oppositional-defiant disorder
pattern and an emerging narcissistic/histrionic/antisocial personality." The jury also heard
Dr. Taylor's statement that "[a]ccording to [Olsen's] parents, his tendency to lie to get out
of trouble and to build himself up dates back to at least age 10."

 Finally, the State presented evidence that Olsen was involved in the death of
Geraldine Lloyd, Kelly Sifuentez's elderly mother. In the summer of 2007, after receiving
information regarding Lloyd's death, police obtained a warrant to search the back yard of the
home Lloyd had shared with Olsen and her daughter. Police found Lloyd's body buried
there. Kelly Sifuentez and Olsen were indicted for Lloyd's murder. A couple of witnesses
testified that they had been told by Kelly or Melissa Sifuentez that Olsen killed Lloyd. Olsen
admitted to a detention officer that he buried Lloyd's body. Lloyd died from a massive blow
to the head, which law-enforcement theorized had been done while she slept. 

 Having viewed all of the evidence in the light most favorable to the jury's finding, we
determine, based on that evidence and reasonable inferences therefrom, that a rational jury
could have found beyond a reasonable doubt a probability that Olsen would pose a
continuing threat to society. We overrule issue thirty.

C. Pre-Trial Motion to Preclude the Death Penalty

 In issues thirty-one and thirty-two, Olsen alleges that the trial judge erred in denying
his pre-trial motion to preclude the death penalty because of his age. At the time of the
offense, Olsen was just a few weeks from his twentieth birthday. The Supreme Court of the
United States has stated that "[t]he age of 18 is the point where society draws the line for
many purposes between childhood and adulthood. It is, we conclude, the age at which the
line for death eligibility ought to rest." (71) Olsen has not persuaded us that he should be
ineligible for the death penalty due to his age at the time of the offense. We overrule these
issues.

D. Constitutional Challenges to Texas's Death Penalty Statute

 Olsen presents several other issues regarding errors in the punishment charge and the
constitutionality of Texas's death penalty statute. In issue thirty-six, Olsen contends that
Article 37.071 violates the Eighth and Fourteenth Amendments because predictions of future
dangerousness are so inaccurate that the future-dangerousness special issue cannot be
answered with any degree of constitutional reliability. Olsen argues that "juries affirmatively
answering the future dangerousness special issue get it wrong 95% of the time." As evidence
in support of his argument, he presents a citation to an article written by the Texas Defender
Service, an advocacy group that represents inmates on death row. (72)

 We addressed this claim in Coble, pointing out that as recently as 2008, the Supreme
Court of the United States recognized the future-dangerousness aggravating factor as
properly narrowing the jury's consideration to ensure individualized sentencing. (73) We also
pointed out that the article presented in that case, which is the same article that Olsen
presents in support of his argument here, "is not the type of 'evidence' upon which we can
base a finding that the 'future dangerousness' special issue is necessarily an unreliable factor
to use in determining whether a life or death sentence is appropriate." (74) We overrule issue
thirty-six.

 In issues thirty-three through thirty-five, Olsen alleges that Texas Code of Criminal
Procedure Article 37.071 is unconstitutional because it impermissibly limits the definition
of mitigating evidence to evidence that jurors might regard as reducing a defendant's moral
blameworthiness. In issues thirty-seven and thirty-eight, Olsen argues that Article 37.071
violates the Sixth and Eighth Amendments of the U.S. Constitution because it impermissibly
places the burden on a defendant to prove sufficient mitigating circumstances. In issues
thirty-nine through forty-five, Olsen alleges that the Texas death penalty scheme is
unconstitutional under the U.S. Constitution. Olsen complains that the capital sentencing
scheme does not permit meaningful appellate review; at least ten "no" votes are required for
the jury to return a negative answer to the punishment special issues (the "10-12 Rule"); and
Article 37.071 prevents jurors from learning of the effect of even one life vote. We have
previously rejected these and similar arguments challenging Article 37.071 in other cases. (75) 
Olsen does not distinguish this case from our prior decisions, and we decline to overrule our
precedent in these areas. We overrule these issues.

V. Conclusion

 Based on the foregoing, we affirm Olsen's conviction. We reverse his sentence and
remand this case to the trial court for a new punishment hearing. 


DELIVERED: April 25, 2012

DO NOT PUBLISH
1. Tex. Penal Code § 19.03(a)(2).
2. See Tex. Code Crim. Proc. art. 37.071, § 2(g) (requiring a trial judge to sentence
a defendant to death upon a jury's affirmative findings of issues under subsection 2(b) and
a negative finding of the issue under subsection 2(e)). 
3. Id. at § 2(h).
4. See McCarthy v. State, 65 S.W.3d 47, 56 n.8 (Tex. Crim. App. 2001) ("Because we
reverse the judgment on the basis of Edwards error, the other issues appellant raises are
moot."); Moore v. State, 969 S.W.2d 4, 6 (Tex. Crim. App. 1998) ("The five remaining
points of error are unlikely to recur on remand, and we shall not address them.").
5. See Demouchette v. State, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986) ("The phrase
'intentionally commits the murder' in Sec[tion] 19.03(a)(2) makes 'intentional' (Sec[tion]
6.03(a)) the culpable mental state necessary for conviction of capital murder under
19.03(a)(2), and excludes the possibility of a 'knowing' capital murder under 19.03(a)(2)."). 
6. Feldman v. State, 71 S.W.3d 738, 750 (2002) (citing Aguilar v. State, 682 S.W.2d
556, 558 (Tex. Crim. App. 1985); Royster v. State, 622 S.W.2d 442, 444 (Tex. Crim. App.
1981)).
7. Id.
8. Id. (citing Cardenas v. State, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000); Moore
v. State, 969 S.W.2d 4, 12 (Tex. Crim. App. 1998)).
9. Id. (emphasis in original). 
10. Id.
11. Skinner v. State, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).
12. Hampton v. State, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003).
13. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).
14. Banda v. State, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).
15. Feldman, 71 S.W.3d at 750. 
16. Tex. Penal Code § 19.03(a)(2).
17. Id. § 19.02(b)(1).
18. Id. § 6.03(a).
19. Id. § 6.03(b).
20. See id. § 19.03(a)(2); Feldman, 71 S.W.3d at 750; see also Medina v. State, 7
S.W.3d 633, 640 (Tex. Crim. App. 1999) (applying section 6.03's definitions of culpable
mental states to murder); Penry v. State, 903 S.W.2d 715, 742 (Tex. Crim. App. 1995)
(applying section 6.03's definition of intent to capital murder).
21. See Rousseau, 855 S.W.2d at 673 (noting the requirement that we "review all of
the evidence presented at trial").
22. See Tompkins v. State, 774 S.W.2d 195, 210-12 (Tex. Crim. App. 1987).
23. See Feldman, 71 S.W.3d at 750.
24. Tex. R. Evid. 104(a).
25. Tex. R. Evid. 702.
26. Tex. R. Evid. 401, 402.
27. Rodgers v. State, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).
28. Vela v. State, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).
29. Lagrone v. State, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997). 
30. Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).
31. Osbourn v. State, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (citing Moreno v.
State, 341 S.W.2d 455, 456, 170 Tex. Crim. 410, 411 (Tex. Crim. App. 1961)).
32. See Weatherred, 15 S.W.3d at 542.
33. Wyatt v. State, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).
34. Id.
35. See Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), overruled on
other grounds by State v. Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) ("[T]o the
extent Nenno decides Article 38.22, Section 6, applies only to custodial statements.").
36. Morris v. State, ___ S.W.3d ___, 2011 Tex. Crim. App. LEXIS 1664, at *42 n.64
& 53 (Tex. Crim. App. Dec. 7, 2011) (citing case examples). 
37. See, e.g., Duckett v. State, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990)
(considering a social worker who had worked many cases involving child sexual abuse to be
an expert in the field of child sexual abuse who could testify to help the jury understand why
the victim changed her testimony and appeared confused), disapproved on other grounds by
Cohn v. State, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993).
38. See Morris, 2011 Tex. Crim. App. LEXIS 1664, at *59 & n.109 (recognizing that
a person may become an expert through experience independent of having a degree in
psychology or psychiatry). 
39. Id.
40. See 970 S.W.2d at 552, 561-62 (recognizing expertise based on an expert's
research, even though the expert was not a psychologist or psychiatrist). 
41. See Morris, 2011 Tex. Crim. App. LEXIS 1664, at *23 & n.39, *53-58.
42. See Weatherred, 15 S.W.3d at 542.
43. See Osbourn, 92 S.W.3d at 538.
44. E.g., Morris, 2011 Tex. Crim. App. LEXIS 1664, at *14-19.
45. Id. at *14 (citing Nenno, 970 S.W.2d at 560).
46. Id. at *19, *58.
47. See id. at *14-15 (citing Nenno, 970 S.W.2d at 561); see also Tillman v. State, 354
S.W.3d 425, 436 (Tex. Crim. App. 2011).
48. See, e.g., Tillman, 354 S.W.3d at 437-38 (discussing, as part of Nenno's third
inquiry, the expert witness's qualifications and whether he sufficiently articulated the
underlying principles and described his rationale when applying his knowledge to
hypothetical scenarios); Nenno, 970 S.W.2d at 560 (citing Kelly v. State, 824 S.W.2d 568,
573 (Tex. Crim. App. 1992), and noting that one factor relating to the determination of
reliability is the experience and skill of the person applying the technique); id. at 561-62
(describing an expert witness's qualifications and methodology together in ascertaining the
reliability of his testimony); cf. Vela, 209 S.W.3d at 131 (distinguishing qualification from
reliability and relevance).
49. See Osbourn, 92 S.W.3d at 538.
50. Tillman, 354 S.W.3d at 438 (citing Jordan v. State, 928 S.W.2d 550, 555 (Tex.
Crim. App. 1996)).
51. Id. at 439.
52. McBride v. State, 862 S.W.2d 600, 610 (Tex. Crim. App. 1993).
53. Id.
54. Id. at n.20.
55. See Fielder v. State, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988); see also
Williams v. State, 895 S.W.2d 363, 365-66 (Tex. Crim. App. 1994) (discussing Duckett and
Cohn as examples of cases in which experts ' testimony was appropriately linked relevant
principles to the facts of the cases when lay witnesses testified that the child victims
displayed some of the characteristics that the experts had testified were commonly displayed
by child victims of sexual abuse).
56. See McBride, 862 S.W.2d at 610; Jordan, 928 S.W.2d at 556.
57. See id. at 610 (noting that the facts upon which an expert testimony is based do not
need to be proved beyond a reasonable doubt and that the expert may assume the truth of the
facts in order to give her testimony). 
58. See McBride, 862 S.W.2d at 610; Jordan, 928 S.W.2d at 556.
59. See Osbourn, 92 S.W.3d at 538 (citing Moreno, 341 S.W.2d at 456, 170 Tex. Crim.
at 411).
60. See Renteria v. State, 206 S.W.3d 689, 698 & n.7 (Tex. Crim. App. 2006) (citing
Tennard v. Dretke, 542 U.S. 274, 284-87 (2004), and applying a Rule 44.2(a) harm analysis
to an erroneous exclusion of constitutionally relevant mitigating evidence); see also Abdul-Kabir v. Quarterman, 550 U.S. 233, 240-44 (2007) (describing expert witness's testimony
as mitigating evidence and finding constitutional error when the trial judge refused to give
an instruction that would have enabled the jury to give it meaningful consideration); Skipper
v. South Carolina, 476 U.S. 1, 8 (1986) (holding that erroneous exclusion of lay witnesses'
testimony that might have affected the jury's decision to impose the death sentence
constituted reversible error "under any standard").
61. Renteria, 206 S.W.3d at 698.
62. See Skipper, 476 U.S. at 8 (holding that erroneous exclusion of relevant mitigating
evidence required reversal when it impeded the sentencing jury's ability to carry out its task
of considering all relevant facets of the character and record of the individual offender).
63. See Renteria, 206 S.W.3d at 696-98 (citing Skipper, 476 U.S. at 9-15 (Powell, J.,
concurring) (arguing that the defendant's death sentence should be vacated, not because the
trial court excluded "relevant mitigating evidence," but because the defendant "was not
allowed to rebut evidence and argument used against him")).
64. See, e.g., Estrada v. State, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010);
Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); Martinez v. State, 924
S.W.2d 693, 698 (Tex. Crim. App. 1996).
65. See, e.g., Hunter v. State, 243 S.W.3d 664, 674 (Tex. Crim. App. 2007); Jackson
v. State, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999).
66. See, e.g., Roberts v. State, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007).
67. Berry, 233 S.W.3d at 860 (citing Jackson v. Virginia, 443 U.S. 307 (1979)).
68. Wardrip v. State, 56 S.W.3d 588, 594 & n.7 (Tex. Crim. App. 2001); Keeton v.
State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).
69. Fuller v. State, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); Sonnier v. State,
913 S.W.2d 511, 517 (Tex. Crim. App. 1995). 
70. Ladd v. State, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).
71. Roper v. Simmons, 543 U.S. 551, 574 (2005).
72. See generally Texas Defender Service, Deadly Speculation: Misleading
Texas Capital Juries with False Predictions of Future Dangerousness (2004).
73. See Coble, 330 S.W.3d at 297.
74. Id. at 298.
75. See, e.g., Roberts v. State, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); Perry v.
State, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); Feldman, 71 S.W.3d at 757.